UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MUHAMMED TILLISY,

                          Plaintiff,

            v.

WASHINGTON STATE
DEPARTMENT OF CORRECTIONS,
*et al.*,

                          Defendants.

CASE NO. 3:18-cv-05695-RJB-JRC

REPORT AND RECOMMENDATION

NOTED FOR: August 28, 2020

        The District Court has referred this 42 U.S.C. § 1983 civil rights action to United States

Magistrate Judge J. Richard Creatura pursuant to 28 U.S.C. § 636(b)(1)(A)–(B), and local

Magistrate Judge Rules MJR1, MJR3, and MJR4.

        Plaintiff, a prisoner who suffers from vision and hearing impairments caused by a brain

"pseudotumor," alleges that since he was taken into Department of Corrections ("DOC") custody

in early 2016, he has been subjected to disability discrimination and cruel and unusual

punishment based on failure to provide various accommodations and on housing him in close

1  custody.  Defendants—various DOC officials—have moved for summary judgment dismissal of

2  plaintiff's claims.

3        Regarding his claims of disability discrimination under the Americans with Disabilities

4  Act ("ADA") and Rehabilitation Act ("RA"), plaintiff has provided no evidence from which a

5  trier of fact could conclude that discriminatory intent motivated defendants' alleged denial of his

6  requests for a hearing aid, pager system, or access assistant—and discriminatory intent is

7  necessary to obtain damages under the ADA and RA.  Instead, the evidence is undisputed that

8  after investigating his claims, defendants believed that plaintiff did not require accommodation

9  other than a hearing aid, which was provided after plaintiff's first hearing test that showed

10  hearing difficulties in his right ear, and that his needs were accommodated without a pager

11  system or access assistant.

12        Regarding his claim of cruel and unusual punishment, plaintiff has provided no evidence

13  from which a rational trier of fact could conclude that plaintiff was subjected to a sufficiently

14  serious risk of harm to form the basis of a claim that defendants failed to protect him.  Instead,

15  plaintiff relies on bare assertions of a threat of harm from being placed in "close custody," which

16  are too conclusory and speculative to be credited as true on summary judgment.   Finally,

17  inasmuch as plaintiff seeks injunctive relief, his request to be transferred from Washington State

18  Penitentiary ("WSP") is moot because he has since been transferred.  Thus, the summary

19  judgment motion should be granted and plaintiff's claims should be dismissed with prejudice.

20  **BACKGROUND**

21  **I.  Plaintiff's Allegations**

22        In August 2018, plaintiff, who proceeds *in forma pauperis* (Dkt. 7), instituted this action.

23  *See* Dkt. 1.  In his amended complaint (Dkt. 17), plaintiff brings claims against DOC and DOC

24

1  "headquarters" officials Risa Klemme (the ADA compliance manager), Kevin Bovenkamp (the

2  assistant secretary"/health services"), and Joiann Miller (a classification manager) and John

3  Campbell (a classification administrator); the Monroe Corrections Center ("MCC") ADA

4  Coordinator, Michael Hathaway; the Clallum Bay Corrections Center ("CBCC") ADA

5  Coordinator, Kaci Price; and the WSP ADA Coordinator, Karen Forss.  Dkt. 17, at 1–2, 5.

6       Plaintiff alleges that he has a condition resulting in vision and hearing impairments and a

7  plate in his skull.  He alleges that this condition requires him to have an "access assistant" and/or

8  pager system and to be housed in a safe environment.  Dkt. 17, at 3, 6.  He claims that DOC

9  unlawfully delayed giving him a hearing aid until July 2018 and never provided him a pager

10  system or assistant.  *See* Dkt. 17, at 3, 13.  He alleges that "without the pager system," he is

11  unable to hear the prison intercom system in order to attend medical treatment, meals, recreation,

12  and other activities.  Dkt. 17, at 3.

13       Plaintiff's complaint was signed under penalty of perjury and is being considered as

14  evidence.  *See* Dkt. 17, at 4.  Because plaintiff is *pro se*, the Court "must consider as evidence in

15  his opposition to summary judgment all of [plaintiff's] contentions offered in motions and

16  pleadings, where such contentions are based on personal knowledge and set forth facts that

17  would be admissible in evidence, and where [plaintiff] attested under penalty of perjury that the

18  contents of the motions or pleadings are true and correct."  *Jones v. Blanas*, 393 F.3d 918, 923

19  (9th Cir. 2004).

20  **II. Attachments to Plaintiff's Complaint**

21       Plaintiff attaches a variety of documents to his complaint.  These include records of one

22  of his requests for a pager system, in late 2018, when he was housed at Coyote Ridge

23  Corrections Center ("CRCC") and claimed that his medical classification code required access to

24

a pager system. *See* Dkt. 17, at 20. Defendant Kaci Price responded that she had requested for

plaintiff to be transferred to a prison that could accommodate plaintiff's request. Dkt. 17, at 18,

20. In September 2018, a DOC record also reflects that plaintiff had requested placement in a

smaller population due to his vision impairment, to avoid "bump[ing] into things." Dkt. 17, at

18.

However, plaintiff was demoted to "close custody" and transferred to WSP—a prison

without a pager system. *See* Dkt. 17, at 19. Defendant Klemme wrote a letter to plaintiff stating

that demotion to close custody meant "that there are only two facilities that can accommodate

your housing," neither of which had pager systems. Dkt. 17, at 26. Defendant Klemme

encouraged plaintiff "to maintain infraction free behavior" so that his custody level could be

promoted and his request could be accommodated. Dkt. 17, at 26. Plaintiff also wrote to

defendant Miller, who responded in September 2018 that due to his close custody level, he could

be housed only in CBCC or WSP. However, because of his behavior he was no longer allowed

at CBCC. Dkt. 17, at 27.

### III. Defendants' Motions for Summary Judgment and Judgment on the Pleadings

Defendants moved for partial judgment on the pleadings and obtained dismissal of

plaintiff's claims that he was discriminated against under the ADA and RA because of his vision

impairment and that substantive due process was violated. *See* Dkt. 46, at 14–15. Although the

District Court granted plaintiff leave to amend, he chose not to amend his complaint. Thus,

plaintiff's ADA and RA claims, at this stage, concern only his claims related to failure to

accommodate his hearing impairment.

Defendants have now moved for summary judgment dismissal of the remainder of

plaintiff's claims. *See* Dkt. 49. Concurrently with their motion, they filed a notice to plaintiff

informing him that if the summary judgment motion were granted, his case would be closed

without a trial or evidentiary hearing.  Dkt. 35.  Defendants rely on plaintiff's medical records as

well as their own declarations.  *See* Dkts. 50–60.

The Court granted a number of requests for extension brought by plaintiff for various

reasons.  Nearly a year later, plaintiff has filed his response to the summary judgment motion

(Dkt. 120), and defendants have filed the reply.  Dkt. 121.  The matter is now ripe for decision.

**DISCUSSION**

**I. Summary Judgment Legal Standard**

Summary judgment is appropriate if a moving party shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  The materiality of a given fact is determined by the required elements of the

substantive law under which the claims are brought.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  Factual disputes that do not affect the outcome of the suit under the governing

law will not be considered.  *Id.*

Where there is a complete failure of proof concerning an essential element of the non-

moving party's case on which the nonmoving party has the burden of proof, all other facts are

rendered immaterial, and the moving party is entitled to judgment as a matter of law.  *Celotex

Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson*, 477 U.S. at 254 ("the judge must view the

evidence presented through the prism of the substantive evidentiary burden").  However, when

presented with a motion for summary judgment, the court shall review the pleadings and

evidence in the light most favorable to the nonmoving party, *Anderson*, 477 U.S. at 255 (citation

omitted), and "a pro se complaint will be liberally construed. . . ."  *Pena v. Gardner,* 976 F.2d

1   469, 471 (9th Cir. 1992) (*citing Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (other citation

2   omitted).

3         Once the moving party has carried its burden under Fed. R. Civ. P. 56, the party opposing

4   the motion must do more than simply show that there is some metaphysical doubt as to the

5   material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The

6   opposing party cannot rest solely on his pleadings but must produce significant, probative

7   evidence in the form of affidavits, and/or admissible discovery material that would allow a

8   reasonable jury to find in his favor. *Id.* at n.11; *Anderson*, 477 U.S. at 249–50. However,

9   weighing of evidence and drawing legitimate inferences from facts are jury functions, and not

10  the function of the court. *See United Steel Workers of Am. v. Phelps Dodge Corps.*, 865 F.2d

11  1539, 1542 (9th Cir. 1989).

12  **II. Plaintiff's Argument about Discovery Issues**

13        In his response to summary judgment, plaintiff states that there are unresolved discovery

14  issues requiring denial of the summary judgment motion. Dkt. 120, at 1. Specifically, plaintiff

15  states that defendants have offered him the option of only 100 free pages out of 7000 total pages

16  of discovery documents, otherwise requiring him to pay for copies. Dkt. 120, at 1. Further, he

17  claims that defendants will not tell him specifically which documents are on what pages, so that

18  he knows which free pages to request. Dkt. 120, at 1.

19        Plaintiff has raised this same argument about discovery documents already, in a motion to

20  compel, and the Court denied plaintiff's motion. *See* Dkt. 109. The Court concluded,

21        [t]o the extent that plaintiff requests that defendants provide documents free of
        charge, the Court will not grant plaintiff's request. Nothing in Federal Rule of Civil
22      Procedure 34 requires that defendants incur expenses or provide copies—they need
        only provide the opportunity to examine the materials. Here, defendants have
23      offered to send a CD to third persons and to provide at least 25 pages of free copies.
        They are not obligated to do more. Although plaintiff asserts that the list of

24

1    documents does not allow him to discern which documents to request from his 25
2    pages, plaintiff does not show that the offer to send a CD to third persons is
     inadequate.

3    Dkt. 109, at 1.  The District Court later overruled plaintiff's objections to this Order.  Dkt. 111,

4    at 2.  Thus the Court has already examined plaintiff's claim that he is being denied access to

5    discovery and has found that it lacks merit.

6        The District Court should not deny summary judgment on the basis of plaintiff's

7    argument about discovery issues.

8    **III.  ADA and RA Claims related to Hearing Impairment**

9        **A.  ADA and RA Standards**

10       The ADA, 42 U.S.C. §§ 12131–34, and the RA, 29 U.S.C. § 794, apply in the prison

11   context.  *See Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1063 (9th Cir. 2010).  "'The [RA] is

12   materially identical to and the model for the ADA, except that it is limited to programs that

13   receive federal financial assistance[.]'"  *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 908 (9th Cir.

14   2013) (quoting *Armstrong v. Davis*, 275 F.3d 849, 862 n.17 (9th Cir. 2001), *abrogated on other*

15   *grounds*, *Johnson v. California*, 543 U.S. 499, 504–05 (2005)).

16       To state a claim for discrimination under Title II of the ADA, a plaintiff must allege that,

17       (1) he "is an individual with a disability;" (2) he "is otherwise qualified to
18       participate in or receive the benefit of some public entity's services, programs, or
         activities;" (3) he "was either excluded from participation in or denied the benefits
19       of the public entity's services, programs, or activities, or was otherwise
         discriminated against by the public entity;" and (4) "such exclusion, denial of
20       benefits, or discrimination was by reason of [his] disability."

21   *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007) (quoting *McGary v. City of*

22   *Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) (internal quotation omitted)).  Similarly, under the

23   RA, a plaintiff must allege that "'(1) he is an individual with a disability; (2) he is otherwise

24

1    qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of

2    his disability; and (4) the program receives federal financial assistance.'" *Id.* (quoting *Duvall v.*

3    *Cty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001)). "Compensatory damages are not available

4    under Title II or § 504 absent a showing of discriminatory intent." *Updike v. Multnomah Cty.*,

5    870 F.3d 939, 950 (9th Cir. 2017) (internal citation omitted).

6                    **B.  Defendants' Evidence**

7            Defendants argue, among other things, that plaintiff cannot show they acted with

8    discriminatory intent.  Dkt. 49, at 15.

9                    **1.  Legal Principles**

10           "To show intentional discrimination, [the Ninth Circuit] requires that the plaintiff show

11   that a defendant acted with 'deliberate indifference,' which requires 'both knowledge that a harm

12   to a federally protected right is substantially likely, and a failure to act upon that . . . likelihood.'"

13   *Updike v. Multnomah Cty.*, 870 F.3d 939, 950–51 (9th Cir. 2017) (quoting *Duvall v. Cty. of*

14   *Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)).

15           "When the plaintiff has alerted the public entity to his need for accommodation . . . , the

16   public entity is on notice that an accommodation is required, and the plaintiff has satisfied the

17   first element of the deliberate indifference test." *Id.* at 951 (internal quotation omitted).  "To

18   meet the second prong, the entity's failure to act must be a result of conduct that is more than

19   negligent, and involves an element of deliberateness." *Id.* (internal citation omitted).  Thus,

20   courts have dismissed ADA claims for damages at summary judgment where a plaintiff has

21   come forward with evidence establishing only that he disagreed with defendants' judgment that a

22   particular accommodation was not medically necessary. *See, e.g.*, *Gosney v. Gower*, No. 6:16-

23   CV-01072-SB, 2019 WL 1447474, at *4 (D. Or. Apr. 1, 2019) (discussing cases).

24

The Court summarizes the parties' evidence regarding whether defendants acted with deliberate indifference to plaintiff's hearing impairment, below.

### 2. MCC (2016)

Defendants rely on plaintiff's medical records and other records of his time in DOC custody from 2016 to 2018, as well as their own declarations.   According to defendants, of the twelve corrections centers in Washington State, only MCC has a "true pager system."  Dkt. 50, at 2.  Access to such a system also depends on classification level, since, for example, prisoners in the intensive management unit ("IMU") have personal escorts for activities so that a pager system is unnecessary.  Dkt. 50, at 3.

Plaintiff resided in MCC until late 2016/early 2017.  Dkt. 51-1, at 28–29.  In January 2016, shortly after intake at DOC, a provider documented that plaintiff could complete his activities of daily living, that he had no need for skilled care, and that he had confirmed that he was able to function in the general population.  Dkt. 51-1, at 50.

According to defendant Hathaway—who worked at MCC at this time—plaintiff's custody level was later demoted to "close" after several infractions.  Dkt. 52, at 2.  Defendant Klemme determined that he should be transferred to WSP, which was one of only two facilities housing "close custody" prisoners.  Dkt. 52, at 2.

### 3. WSP (Early 2017)

DOC transferred plaintiff to WSP, where he was housed until mid-2017.  Dkt. 51-1, at 28.  In April 2017, plaintiff complained of decreased hearing in his right ear over the past few months, in addition to the pre-existing deafness in his left ear, and his provider diagnosed sinusitis.  Dkt. 51-1, at 250–51.  In June 2017, a provider examined him again and determined

1    that his hearing was "grossly intact."  Dkt. 51-1, at 258.  In mid-2017, plaintiff's custody level

2    was promoted, and he returned to MCC.  Dkt. 52, at 2.

3                              **4.  MCC (Late 2017)**

4           At MCC, plaintiff requested use of the pager system.  *See* Dkt. 51-1, at 88, 265.

5    Defendant Hathaway submitted plaintiff's request, which a senior custody officer approved.

6    Dkt. 51-1, at 87.  However, based on a provider's notation that his "hearing does not qualify as

7    requiring a hearing aid or pager by DOC policy" (Dkt. 51-1, at 265) and a hearing test (Dkt. 51-

8    1, at 84, 266), the review committee denied plaintiff's request.  Dkt. 51-1, at 88; Dkt. 52; *see*

9    *also* Dkt. 53, at 2 (an MCC provider states that during plaintiff's time at MCC, based on his

10   hearing tests and presentation at medical appointments, he did not qualify for a pager or access

11   assistant).  In December, defendant Klemme wrote to plaintiff regarding his request for a pager,

12   referencing the hearing test and also noting that because plaintiff was then housed in the IMU, a

13   pager was unnecessary.  Dkt. 51-1, at 97.

14                           **5.  WSP and CBCC (2018)**

15          By January 2018, plaintiff had been transferred to CBCC, after a brief stay at WSP.  Dkt.

16   51-1, at 28.  In January, Dr. William Aurich, the facility medical director, noted that plaintiff had

17   made "a number of ADA requests" but that his "hearing was completely normal," he "never

18   miss[ed] a question," and, according to a corrections officer, he did not appear to have hearing

19   problems because he could hear the loudspeaker and had not missed any loudspeaker calls.  Dkt.

20   51-1, at 56–57.  Dr. Aurich opined that plaintiff did not require an "inmate assistant" or "therapy

21   aide."  Dkt. 51-1, at 56–57.  Dr. Aurich states in his declaration that during plaintiff's time at

22   CBCC, he "was always able to answer all of the questions I asked him and had no problem

23   hearing my questions. . . .  While he was at [CBCC], [plaintiff] never complained to me about

24

1    not being able to hear intercom announcements." Dkt. 55, at 2.  In February 2018, plaintiff

2    requested a therapy aid, but his request was denied on the basis of Dr. Aurich's conclusion that

3    plaintiff did not meet the criteria for such an accommodation.  Dkt. 51-1, at 90.

4         Records from April and May 2018 include that during this period, plaintiff told providers

5    his ultimate goal was transfer to MCC where he could visit his family and friends and that he

6    "[wa]s hoping that his physical health problems will work in his favor[.]" Dkt. 51-1, at 58–59.

7    Of note, in April, plaintiff requested a change to his medical classification code (to "E4")

8    because he wanted to transfer and obtain a custody promotion, but his provider refused, stating

9    that there was "no evidence of hearing impairment in both ears, just one." Dkt. 51-1, at 61; *see*

10   *also* Dkt. 51-1, at 62 (noting that "grossly," plaintiff's hearing in his right ear was normal).

11        On April 16, Dr. Aurich noted that plaintiff was suffering from ear infections impacting

12   his hearing from his right ear but that nevertheless, his hearing in that ear was still "grossly

13   normal." Dkt. 51-1, at 291.  Dr. Aurich documented that plaintiff wanted his status changed to

14   "E4" to "facilitate placement out of CBCC" but scheduled plaintiff for a hearing test, regardless.

15   Dkt. 51-1, at 291; *see also* Dkt. 51-1, at 65.  Later in April, plaintiff's hearing had improved.

16   Dkt. 51-1, at 293.  Plaintiff was nevertheless prescribed a hearing aid for his right ear based on

17   the results of the evaluation scheduled by Dr. Aurich.  Dkt. 51-1, at 66, 83.

18        Later in May 2018, a nurse's note reflects that although plaintiff again requested a

19   classification override code change, because plaintiff had recently been fitted for a hearing aid in

20   his right ear, the nurse concluded that "[right] ear hearing will be corrected" and declined to

21   change the code.  Dkt. 51-1, at 63.  In September 2018, Dr. Aurich again noted that plaintiff

22   "always answers my questions accurately without confusion" and was observed as attending

23   mainline during callouts.  Dkt. 51-1, at 64.

24

1    In August 2018, plaintiff had attempted to persuade DOC staff that his medical code had

2    been changed to "E4" in order to impede a pending transfer to Coyote Ridge Corrections Center.

3    *See* Dkt. 51-1, at 108.  However, Dr. Aurich stated that he had not recommended a paging

4    system, that plaintiff appeared to have no hearing deficiencies on examination, and that plaintiff

5    was "very effective at manipulating the system[.]"  Dkt. 51-1, at 111.

6    In late 2018, plaintiff was transferred back to WSP.  Dkt. 51-1, at 27.  Defendant

7    Klemme, who approved plaintiff's transfer to WSP, states that WSP staff members informed

8    her that plaintiff "does not miss appointments, which are announced over the intercom"; "does

9    not complain about not being able to hear the intercom," and "has a hearing aid the uses and he

10   seems to be functioning well."  Dkt. 50, at 4.  Similarly, a WSP official states that plaintiff has

11   not had issues with job attendance or been infracted for missing any call outs since his transfer

12   back to WSP.  *See* Dkt. 59, at 2.

### 6. Defendants' Declarations

14   Defendant Klemme (DOC's ADA compliance manager) states that she was aware of

15   plaintiff's August 2017 and February 2018 requests for, respectively, a pager system and access

16   assistant but that based on plaintiff's medical providers' judgment that plaintiff did not require

17   the accommodations, the requests were denied.  Dkt. 50, at 3.  Defendant Klemme does not

18   believe that plaintiff requires a pager system, since such is required only by "profoundly deaf"

19   prisoners.  Dkt. 50, at 4.

20   Defendant Hathaway, an MCC official familiar with plaintiff and his requests, states that

21   during plaintiff's time at MCC, plaintiff "did not miss call outs for meals, showers, recreation

22   time, religious worship, medical appointments, the law library, or anything else"; nor did he

23   "complain to [defendant Hathaway] about not being able to hear the call outs."  Dkt. 52, at 3.

24

1    Defendant Forss, the WSP ADA coordinator, states that although WSP does not have a

2    paging system, accommodations such as an access assistant are available.  Dkt. 54, at 2.  She

3    states that plaintiff has contacted her about a pager system and, when she has suggested

4    alternatives, has been "only interested in a paging system."  Dkt. 54, at 2.  She therefore

5    understands his requests to be efforts to be transferred back to MCC.  Dkt. 54, at 2.

6    Defendant Price, formerly the CBCC ADA coordinator, states that in mid-2018, she told

7    plaintiff that she would attempt to have him moved to a facility with a paging system.  Dkt. 60, at

8    2.  She states that she told plaintiff this based solely on a database entry that plaintiff had a

9    hearing impairment and that when plaintiff was found guilty of various infractions afterward, his

10    placement was out of her hands.  Dkt. 60, at 2.

11    Defendant Campbell, the DOC classifications administrator, states that plaintiff was

12    scheduled to be transferred to SCCC in mid-2018; however, plaintiff's actions complicated the

13    transfer.  Dkt. 57, at 2–3.  Defendant Campbell learned that plaintiff "had been overheard telling

14    another inmate that [plaintiff] wanted to go to [SCCC] because it is easier to get drugs into that

15    facility."  Dkt. 57, at 2.  Although Coyote Ridge Corrections Center ("CRCC") was considered

16    as an option, DOC discovered that plaintiff had been impersonating a foreign diplomat's staff,

17    trying to manipulate his transfer.  *See* Dkt. 57, at 2.

18    Thus, based on plaintiff's custody status and that his providers stated he did not need a

19    paging system, plaintiff was transferred to WSP.  Dkt. 57, at 3.  According to defendant

20    Campbell, "[plaintiff] seems intent on returning to" MCC, but defendant Campbell "has

21    concerns" based on plaintiff's ability to obtain drugs at MCC in the past, his remarks about

22    SCCC, and an attempt plaintiff made to smuggle drugs into CBCC.  Dkt. 57, at 3.  Defendant

23

24

REPORT AND RECOMMENDATION - 13

1   Campbell states that "if we transfer him back to [MCC] in the near future, it will only be after we

2   are relatively certain that he will not engage in smuggling drugs into that facility."  Dkt. 57, at 3.

3                        **C.  Plaintiff's Evidence and No Genuine Issue of Material Fact**

4           Here, defendants' evidence, as summarized above, supports that factors other than

5   discriminatory intent motivated defendants' delay in providing plaintiff with a hearing aid and

6   refusal to provide plaintiff with a paging system and access assistant.  Providers and hearing tests

7   throughout 2016 and 2017 indicated that plaintiff had no need for a hearing aid for his right ear.

8   *See* Dkt. 51-1, at 56–57, 61–62, 258, 265, 266, 290, 291; Dkts. 52, 53, 55.  Throughout this time,

9   defendants who were familiar with plaintiff noted no problems attending call outs or deficiencies

10  in his hearing.  *See, e.g.*, Dkt. 52, at 3.  Shortly after a hearing test in 2018 revealed some hearing

11  deficiency in plaintiff's right ear, plaintiff was given a hearing aid.  Dkt. 51-1, at 66, 83.

12          After this, his providers continued to uniformly document that plaintiff did not have

13  hearing issues that required additional accommodations of an access assistant or use of a pager

14  system.  *See* Dkt. 51-1, at 27, 63, 64, 111; *see also* Dkts. 50, 59.  The Ninth Circuit has cautioned

15  that in this context, "[a] denial of a request without investigation is sufficient to survive summary

16  judgment on the question of deliberate indifference."  *Updike v. Multnomah Cty.*, 870 F.3d at

17  954.  But here, there is no dispute in the evidence that in response to plaintiff's requests,

18  defendants investigated the matter, including reviewing plaintiff's records, interviewing prison

19  staff members, and making decisions in conjunction with plaintiff's providers'

20  recommendations, to determine which facilities would be appropriate to accommodate plaintiff's

21  needs.  *See* Dkt. 50, at 4–5; Dkt. 52, at 2; Dkt. 57, at 2–3.  The undisputed testimony is that as a

22  result of this investigation, defendants simply disagreed that plaintiff required the

23

24

1  accommodations he requested.  This is insufficient to amount to deliberate indifference or

2  discriminatory intent.

3       During the investigation into plaintiff's needs, defendants state that they learned that

4  plaintiff had non-disability-related motives for requesting a pager system, including his efforts to

5  return to MCC.  Dkt. 50, at 2.  Plaintiff's providers noted on multiple occasions that he told them

6  he wanted his medical classification changed to effect his transfer, and, at one point, he even

7  attempted to trick DOC staff into thinking that his providers had recommended a transfer to

8  MCC.  *See* Dkts. 51-1, at 58–59, 108, 111.  Defendants state—and their evidence corroborates—

9  that their refusals to grant him access to a pager system or to transfer him back to MCC, where

10 there was a pager system, were based on plaintiff's medical records (Dkt. 51-1, at 90, 97), that a

11 pager was unnecessary when he was housed in MCC IMU (Dkt. 51-1, at 97), and that plaintiff

12 could not be transferred back to MCC until they were certain he would not be able to smuggle

13 drugs into that facility again.  Dkt. 57, at 3.  Again, this does not amount to deliberate

14 indifference or discriminatory intent.

15      For his part, plaintiff provides no substantive evidence that rebuts defendants' evidence

16 as material to this summary judgment motion.  He does not provide any evidence that supports

17 that deliberate indifference or discriminatory intent motivated defendants' decisions.  Plaintiff

18 instead relies on his own statements that "without the pager system, plaintiff is unable to hear

19 [the] intercom system. . . ." (Dkt. 17, at 3), that various defendants were personally aware of

20 plaintiff's "requests for accommodations" (Dkt. 17, at 4), and that plaintiff's records document

21 his "visual and hearing impairments" (Dkt. 17, at 7).  But plaintiff provides no evidence that

22 their actions, or inactions, were motivated by deliberate indifference or discriminatory intent.  On

23 this crucial point, defendants' declarations are uncontradicted.

24

1    Plaintiff argues that defendants could simply have overridden his custody level—which

2    they later did, so that he could be housed in a facility with a pager system. Dkt. 120, at 2. In

3    support of this argument, he attaches custody facility plan documents stating that in mid-2019, he

4    became eligible for "medium custody (MLC)" and was transferred to SCCC based on his recent

5    infraction-free behavior. Dkt. 120, at 8–9. His medical classification was changed to "E4"—the

6    status that plaintiff sought before. *See* Dkt. 120, at 9. By February 2020, plaintiff had five

7    additional serious infractions, his custody level was demoted based on "on going drug related

8    infractions," and he was recommended for transfer to MCC-IMU because of proximity to his

9    specialty health care providers for appointments. *See* Dkt. 120, at 11–12.

10    However, the reasons for the change in plaintiff's medical classification override are not

11    discussed in plaintiff's materials and, without any explanation on this point, these additional

12    records do not raise any genuine factual issues. The Court must take the evidence in the light

13    most favorable to plaintiff—but this does not include speculating or inventing evidence for

14    plaintiff that he has not provided.

15    Plaintiff argues in his responsive brief that he has missed "dozens" of call outs. Dkt. 120,

16    at 2. This conclusory assertion that is not made under penalty of perjury should not be credited

17    as true on summary judgment. *See Jones*, 393 F.3d at 923. Even if it were credited as true,

18    whether or not plaintiff in fact missed "dozens" of call outs does not contradict defendants'

19    declarations that they did not know he was missing any call outs and, based on their interactions

20    with plaintiff and his providers' opinions, believed he did not require additional

21    accommodations.

22    Plaintiff argues in response to summary judgment that a December 2016 hearing test was

23    "falsified" to show that he could hear from his left ear. Dkt. 120, at 2, 5. Plaintiff refers to a

24

REPORT AND RECOMMENDATION - 16

1    record in which plaintiff's hearing test results were crossed out with the notation "error."  Dkt.

2    120, at 5.  The Court has not relied on this record in reaching the conclusions outlined in this

3    report and recommendation.  To the extent that plaintiff is arguing that there are factual issues

4    created by this record, defendants concede—and the record reflects—that plaintiff is deaf in his

5    left ear.  *See* Dkt. 49, at 3.  Thus, there are no factual issues involving plaintiff's hearing from his

6    left ear on summary judgment.

7    Plaintiff asserts that the call-out records relied on by defendants are not probative because

8    they are records of calls—not attendance.  *See* Dkt. 120, at 2.  The Court agrees and has not

9    relied on the call out records in coming to the conclusions herein.

10    Plaintiff has failed to submit evidence from which a trier of fact could conclude that

11    defendants were deliberately indifferent to his needs.  Therefore, his damages claims under the

12    ADA and RA should be dismissed with prejudice.

13    **IV.  Eighth Amendment Claims for Damages**

14    Plaintiff brings claims under the Eighth Amendment for deliberate indifference based on

15    the same allegations as his ADA and RA claims.  *See generally* Dkt. 17.  However, "a plaintiff

16    cannot bring an action under 42 U.S.C. § 1983 against a State official in her individual capacity

17    to vindicate rights created by Title II of the ADA or section 504 of the Rehabilitation Act."

18    *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002).  And, such claims against defendants in

19    their official capacities for damages are barred by sovereign immunity.  *See Pennhurst State Sch.*

20    *& Hosp. v. Halderman*, 465 U.S. 89, 101 (1984).

21    Therefore, the undersigned interprets plaintiff's Eighth Amendment claims for damages

22    as claims that prison officials, acting in their individual capacities, failed to protect him from

23    harm when they housed him at "the highest custody level."  *See* Dkt. 17, at 6, 8 (alleging that

24

1    plaintiff cannot protect himself and should not have been placed in the highest custody level at

2    WSP "where it is volatile, dangerous & hostile").  Plaintiff's only specific allegation forming the

3    basis for this claim is that in September 2018, he informed defendants Miller and Campbell that

4    he would die if hit in the head, but that they placed him in WSP close custody, anyway.  *See* Dkt.

5    17, at 8.  The remainder of his allegations are too conclusory and general to be taken as true on

6    summary judgment.  *See Leer*, 844 F.2d at 633–34.

7         Defendants move for summary judgment on the basis that plaintiff has not provided

8    evidence from which a trier of fact could conclude that plaintiff was subjected to a risk that

9    violated contemporary standards of decency.  *See* Dkt. 49, at 21.  "For an inmate to bring a valid

10   § 1983 claim against a prison official for a violation of the Eighth Amendment, he must first

11   "objectively show that he was deprived of something 'sufficiently serious.'"  *Lemire v.*

12   *California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013) (quoting *Foster v.*

13   *Runnels,* 554 F.3d 807, 812 (9th Cir. 2009)).  "'A deprivation is sufficiently serious when the

14   prison official's act or omission results in the denial of the minimal civilized measure of life's

15   necessities." *Id.* (quoting *Foster*, 554 F.3d at 812).

16        Here, defendants have come forward with evidence that plaintiff was not at a greater risk

17   of harm than other prisoners.  They acknowledge that plaintiff states that he has a plate that

18   covers "a piece of his skull [that was] removed" but rely on plaintiff's medical records, which

19   include that in late 2016, he had surgery to repair and protect the area.  *See* Dkt. 17, at 6; Dkt. 51-

20   1, at 45.  The surgeon did not restrict plaintiff's ability to be around other prisoners based on

21   safety concerns, noting only that plaintiff had to avoid strenuous activity until cleared by his

22   doctor.  *See* Dkt. 51-1, at 46.

23

24

1    Plaintiff does not provide any medical opinion or other evidence that, two years after his

2    surgery, he required additional protection.  Instead, he relies on his own medical opinion that if

3    he suffers a blow to the head, he could die or suffer brain damage.  However, plaintiff cannot

4    rely upon speculation without explaining how he has personal knowledge of such a matter.  *See*

5    Fed. R. Civ. Proc. 56(c)(4).  Nor can he offer a medical opinion.  *See* Fed. R. Evid. 701.

6    Therefore, plaintiff's opinion that he is at risk for brain injury or death is not enough to create a

7    factual issue that would defeat the summary judgment motion.

8    Plaintiff does not provide any other evidence that his custody placement at WSP placed

9    him in a sufficiently serious threat of danger to claim that defendants failed to protect him.

10   Plaintiff asserts that he was in greater danger because "close custody" is "volatile, dangerous &

11   hostile" but he does provide any basis for his conclusion that "close custody" is more dangerous

12   than other WSP classifications.  Without an evidentiary basis, this speculative assertion cannot

13   be taken as true on summary judgment.

14   For these reasons, the Court should find that plaintiff has not come forward with evidence

15   from which a trier of fact could find that the danger he was allegedly placed in at WSP was a

16   sufficiently serious deprivation to form the basis for a § 1983 deliberate indifference claim.  His

17   Eighth Amendment claims should be dismissed with prejudice.

18   **V.  Injunctive Relief**

19   The Court notes that plaintiff seeks injunctive relief in the form of a Court Order for

20   "placement [at] ADA accommodate[ing] facilities for visual and hearing imp[airments] [and]

21   placement in [a] safe environment where risk to health [and] safety is <u>low</u>"—plaintiff suggests

22   MCC.  Dkt. 17, at 4.  This request is too vague to form the basis for relief.  *See* 18 U.S.C. §

23   3626(a)(1)(A) ("Prospective relief in any civil action with respect to prison conditions shall

24

extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs.").

Because plaintiff was housed in WSP when he filed his complaint and because his claims related to injunctive relief appear to be that his WSP housing was unsafe and did not accommodate his disabilities, the undersigned interprets plaintiff's claim more narrowly, as requesting to be transferred out of WSP.

Based on plaintiff's evidence provided with his reply brief, he has since been transferred to SCCC and authorities have recommended his future transfer to MCC. *See* Dkt. 120, at 11–12. A DOC official has stated that plaintiff's medical needs can no longer be met at WSP. Dkt. 120, at 12. Therefore, plaintiff's claims for injunctive relief should be dismissed as moot. *See Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991) (per curiam) (providing that a prisoner's claims for injunctive relief relating to prison conditions are rendered moot by his transfer to another facility).

## VI.  *In Forma Pauperis* **on Appeal**

*In forma pauperis* ("IFP") status on appeal shall not be granted if the district court certifies "before or after the notice of appeal is filed" "that the appeal is not taken in good faith[.]" Fed. R. App. P. 24(a)(3)(A); *see also* 28 U.S.C. § 1915(a)(3).  A plaintiff satisfies the "good faith" requirement if he seeks review of an issue that is "not frivolous," and an appeal is frivolous where it lacks any arguable basis in law or fact. *Gardner v. Pogue*, 558 F.2d 548, 551 (9th Cir. 1977); *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  These are not frivolous issues. Therefore, the undersigned does not recommend revoking plaintiff's IFP status for purposes of any appeal.

///

1

**CONCLUSION**

2        The undersigned recommends that defendants' motion for summary judgment (Dkt. 49)

3   be granted and that plaintiff's remaining claims be dismissed with prejudice.

4        Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

5   fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P.

6   6.  Failure to file objections will result in a waiver of those objections for purposes of *de novo*

7   review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver

8   of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v.*

9   *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted).  Accommodating the time limit

10  imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **August 28,**

11  **2020,** as noted in the caption.

12        Dated this 10th day of August, 2020.

13

14

15

16        J. Richard Creatura
          United States Magistrate Judge

17

18

19

20

21

22

23

24